ML:EMR
F. #2018R01374

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

19M1057

IN THE MATTER OF THE SEARCH OF:
26-14 18TH STREET, APARTMENT C3,
ASTORIA, NEW YORK AND
CELLULAR TELEPHONES FOUND
THEREIN

**Filed Under Seal**

**APPLICATION FOR A SEARCH
WARRANT FOR A PREMISES AND
CELLULAR TELEPHONES
FOUND THEREIN**

Case No.

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Patrick Jochum, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search the premises known as 26-14

18th St, Apartment C3, Astoria, New York, hereinafter the "SUBJECT PREMISES," further

described in Attachment A, for the things described in Attachment B.

2.     I have been a Special Agent with the United States Department of

Homeland Security, Homeland Security Investigations ("HSI") (the "Investigating Agency")

since 2016. As such, I am a "federal law enforcement officer" within the meaning of Federal

Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the

criminal laws and duly authorized to request a search warrant. I am currently assigned to

HSI's New York Office and, more specifically, to a squad that investigates human trafficking and alien smuggling matters.

      3.      I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for transnational sex and human trafficking and related offenses. In that capacity, I have participated in investigations involving the debriefing of sex trafficking victims, review of telephone records, cell site location and GPS data, review of money transfer records, surveillance, analysis of pen register information, and various other techniques. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

      4.      Information in this affidavit resulting from surveillance does not always set forth my personal observations, but rather, at times reflects information provided to me by other law enforcement agents or other individuals who observed the events described, and to whom I have spoken or whose reports I have read.

      5.      Based on the facts set forth in this affidavit, there is probable cause to search the SUBJECT PREMISES further described in Attachment A for the items described in Attachment B, which constitute evidence, fruits and instrumentalities of the offenses of or

2

activities relating to racketeering and racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(c), 1962(d) and 1963, sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c), alien smuggling conspiracy, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i), interstate prostitution conspiracy, in violation of 18 U.S.C. §§ 371 and 2422(a), money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and distribution of prostitution proceeds, in violation of 18 U.S.C. §§ 1952(a)(1)(A) and 1952(b)(1) (the "Subject Offenses"), committed by Arcelia Hernandez-Velazquez ("Arcelia") and others known and unknown between March 2001 and September 2019.

## **THE SUBJECT PREMISES**

6.      The SUBJECT PREMISES is located at 2614 18th Street, Apartment C3, Astoria NY 11102. The SUBJECT PREMISES is located inside of a four-story apartment complex, with a brick exterior and a brown main door entrance. The SUBJECT PREMISES is located on the 3rd floor of the apartment complex and the door of the SUBJECT PREMISES is identified with the marking of C3. Attachment A to the proposed Warrant includes a photograph of the front door to the SUBJECT PREMISES, which is the door on the left side of the photograph with pumpkin decorations and "3C" at the top of the door, and a photograph from Google Maps, downloaded on or about November 6, 2019, which depicts the exterior of the building containing the SUBJECT PREMISES.

3

## PROBABLE CAUSE

### A. Probable Cause of the Commission of the Subject Offenses

7.     I have been involved in an investigation regarding the crimes of sex trafficking, forced labor, alien smuggling, the importation of aliens for immoral purposes and conspiracy to commit money laundering, involving multiple individuals including Arcelia and others known and unknown.

8.     In May 2018, law enforcement officers initiated an investigation into a sex trafficking organization that is operated by members of the Hernandez-Velazquez family (the "Hernandez-Velazquez sex trafficking organization"). Based upon information gathered during this investigation, there is probable cause to conclude that Arcelia is a member of or associated with the Hernandez-Velazquez sex trafficking organization. As part of the investigation, agents have interviewed multiple females to date who have provided information about the organization's smuggling of females into the United States and then requiring them to engage in commercial sex through force, fraud and coercion.

9.     Among these females are Jane Doe #1, Jane Doe #2 and Jane Doe #3, who have confirmed that Arcelia and other members of the Hernandez-Velazquez sex trafficking organization have and are continuing to smuggle multiple females into the United States and force them to work in prostitution.

10.     Jane Doe #1 has advised law enforcement, in substance and in part, as follows:

4

a.  Jane Doe #1 met Arcelia's brother Hugo Hernandez-Velazquez "(Hugo") in
Mexico in 2001, when she was approximately 21 years old.  They began
dating, and Jane Doe #1 moved in with Hugo and his family in Tenancingo,
Mexico.  While Jane Doe #1 was living with Hugo, he monitored her phone
calls and would not allow her to leave the house unless he, his brother
Giovanni Hernandez-Velazquez ("Giovanni") or his mother were with her.
After approximately one month of living together, Jane Doe #1 found out that
she was pregnant.  Hugo took her to a doctor who gave her medicine that
caused her to have an abortion.

b.  Hugo pressured Jane Doe #1 to work in prostitution to make money for her
children and so that she and Hugo could have a better life together.  Jane Doe
#1 felt desperate and gave into Hugo's demands.  Hugo forced her to prostitute
in hotels in Mexico and took all of the money that she made.  After a few
months, Jane Doe #1 learned that she was pregnant with Hugo's child, and he
made her get another abortion.  While they were in Mexico, Hugo was
physically violent with Jane Doe #1 several times.

c.  Hugo pressured Jane Doe #1 to move to the United States, telling her that they
could have a better life together and make more money in the United States.
In 2002, Hugo made arrangements to smuggle them into the United States.
They were arrested at the border and returned to Mexico, but they crossed
again and were successful.  Jane Doe #1 and Hugo travelled to Queens, New

5

York. They lived in an apartment across from the SUBJECT PREMISES, where Arcelia lived.

d. Within two months of arriving in the United States, Jane Doe #1 began working in prostitution. Hugo took all of the money that she made in prostitution. Jane Doe #1 also travelled to work in prostitution in several other states, including Delaware, Connecticut, Boston, Rhode Island, Maryland, Virginia, Washington D.C. and New Jersey.

e. Hugo was very violent with Jane Doe #1 and forced her to have a third abortion. Eventually, Hugo returned to Mexico.

f. After Hugo left in approximately 2005, Arcelia supervised Jane Doe #1's work in prostitution and made sure that Jane Doe #1 sent the money that she made to Hugo and other members of his family in Mexico. After each week, the money that Jane Doe #1 earned from prostitution was put into an envelope, and Arcelia would check the envelope to know how much Jane Doe #1 had made. Arcelia then would accompany Jane Doe #1 to the store to send money back to Mexico. Arcelia also went with Jane Doe #1 to the store to buy condoms and other necessities.

g. In approximately 2005, Jane Doe #1 was arrested by United States immigration agents and she returned to Mexico. While she was there, Jane Doe #1 went to visit her children and was shocked to see the condition of their house. Although Hugo had told Jane Doe #1 that he had been sending money

6

to her children, it was obviously not true. Jane Doe #1 asked Hugo for money for her children, and he told her that she knew what she needed to do to help her children. As a result, Jane Doe #1 chose to return to the United States. She crossed back into the United States during the summer of 2005.

h. When she got back to the United States, Jane Doe #1 lived with Arcelia at the SUBJECT PREMISES for approximately a year and a half, beginning in approximately late 2005 and into 2007. She continued working in prostitution and sending the money she made to Hugo and his family. While she was living in the United States, Hugo and Giovanni went to her mother's house approximately three times to threaten her. On one of those occasions, Jane Doe #1 received a call from Hugo, who was at her mother's house with Giovanni. Hugo put Jane Doe #1's mother on the phone and then Hugo threatened Jane Doe #1. On another occasion, Hugo took Jane Doe #1's son for a day to threaten her. After approximately a year and a half, in 2007, Jane Doe #1 left Hugo. She was afraid, so she kept sending Hugo money until approximately 2008.

11. The information that Jane Doe #1 has provided is corroborated by, among other things, border crossing records and wire transfer records.

12. Jane Doe #2 has advised law enforcement, in substance and in part, as follows.

a. Jane Doe #2 met Ernesto Hernandez-Velazquez (hereafter "Ernesto"), who is the brother of Arcelia, Hugo and Giovanni, in approximately 2008, when Jane Doe #2 was she living in the United States. Jane Doe #2 returned to Mexico, and began dating Ernesto. After approximately a year of living together, Ernesto began telling Jane Doe #2 that they could have a better life together and make more money in the United States. He pressured her to go to the United States and claimed that her parents did not care for her as a reason for her to go. Jane Doe #2 eventually agreed to travel to the United States. For two weeks before she went to the United States, Ernesto had Jane Doe #2 prostitute in a hotel in Mexico City, and he took all of the money that she made.

b. In 2009, Ernesto made arrangements to smuggle Jane Doe #2 into the United States and she traveled to Atlanta, Georgia. She soon began working in prostitution, supervised by Hugo. Jane Doe #2 sent the money that she made to Ernesto. Ernesto arrived in the United States approximately three months after Jane Doe #2, and they lived in Atlanta for two to three years. In 2011, Jane Doe #2 became pregnant. During the pregnancy, Ernesto was violent with her. He slapped Jane Doe #2 across the face, shoved her and pushed her. When she was six months pregnant, they moved to Queens, New York. Ernesto continued to beat her.

8

c. After Jane Doe #2 gave birth, Ernesto insisted that she go back to work in prostitution. Arcelia would travel to Jane Doe #2's apartment to take care of the baby, while Jane Doe #2 worked. Jane Doe #2 worked six days a week and gave all of the money she made to Ernesto. In 2012, Ernesto and Jane Doe #2 moved to Charlotte, North Carolina for several months, and she worked in prostitution there.

d. In January 2013, Jane Doe #2 and Ernesto returned to Queens, New York. She was forced to travel frequently for work, and she worked in a variety of cities and states, including Atlanta, Savannah, Alabama, New Orleans, Mississippi, Charlotte, Raleigh, Virginia, Maryland, Washington D.C., Boston and Cortland, New York. After giving birth to a second child, Jane Doe #2 separated from Ernesto.

e. On July 29, 2015, Jane Doe #2 had dinner with Ernesto and their children. That night, Ernesto sexually and physically assaulted Jane Doe #2. She called the police, and he was arrested. As a result of his assault of Jane Doe #2, Ernesto was charged in Queens County with the sexual and physical assault. In June 2016, Ernesto pleaded guilty to Criminal Sexual Act in the First Degree in Queens County Supreme Court, and was subsequently sentenced to five years in custody.

13.     The information that Jane Doe #2 has provided is corroborated by, among other things, border crossing records and wire transfer records. In addition, law

9

enforcement recovered a telephone from Ernesto, which contained photographs of the assault, as well as a record in his internet search history of looking up an EDNY case related to charging Mexican nationals with sex trafficking.

14.     Jane Doe #3 has advised law enforcement, in substance and in part, as follows.

> a.  Jane Doe #3 met Hugo in Mexico in 2012. Soon thereafter, Jane Doe #3 moved into Hugo's house. Initially, Hugo sent money to support Jane Doe #3's children, but eventually Hugo began pressuring her to work in prostitution. Jane Doe #3 felt desperate because Hugo told her that the only way to help her children was to work in prostitution.
>
> b.  Jane Doe #3 began working in prostitution and giving all of the money that she made to Hugo. Hugo would search her bags and make sure that Jane Doe #3 gave all the money she made to him. Approximately three months after Jane Doe #3 started living with Hugo, Hugo beat her violently by slapping, punching and kicking her and struck her against the forehead with his belt. In order to escape from Hugo, Jane Doe #3 jumped out of a window and sustained substantial injuries that took her months to recover fully. That was the first of many times that Hugo was physically violent with Jane Doe #3.
>
> c.  While she was working for Hugo, Jane Doe #3 became pregnant on two occasions. Both times, Hugo forced Jane Doe #3 to get an abortion.

10

  d. Hugo told Jane Doe #3 that she could earn a lot more money working in prostitution in the United States, and he made the arrangements for her to be smuggled into the United States. In 2016, Jane Doe #3 crossed into the United States. On her first attempt, she was arrested and returned to Mexico. On her second attempt, Jane Doe #3 was successful and she was taken to Atlanta.

  e. As soon as she arrived in Atlanta, Hugo told Jane Doe #3 that she needed to work in prostitution. She began to work in prostitution again and to send all the money that she made back to Hugo and his family.

  f. After Jane Doe #3 arrived in the United States, she learned that she was pregnant. Hugo forced her to have a third abortion.

  g. While she was living in the United States, in approximately 2017, Jane Doe #3 lived at the SUBJECT PREMISES with Arcelia for approximately one month. When was she living there, Arcelia would get angry with Jane Doe #3, because Jane Doe #3 did not want to work in prostitution. Arcelia told Jane Doe #3 that she had to work in prostitution, and that prostitution was the reason that Jane Doe #3 came to the United States.

  h. Eventually, in approximately February 2018, Jane Doe #3 stopped working for Hugo and cut off communication with him.

  15. The information that Jane Doe #3 has provided is corroborated by, among other things, border crossing records and wire transfer records.

11

16.     In addition, information provided by Jane Doe #3 has revealed that Hugo and other members of the Hernandez-Velazquez trafficking organization are continuing to smuggle additional females into the United States and force them to work in prostitution.

17.     Specifically, in July 2019, a female, Jane Doe #4, contacted Jane Doe #3 over Facebook messenger and indicated that she was dating Hugo, and that Hugo wanted Jane Doe #3, Jane Doe #4 and Hugo to be together.   Soon thereafter, Jane Doe #4 began texting Jane Doe #3.  Jane Doe #4 indicated that she was in California.  Jane Doe #4 told Jane Doe #3 that she and HUGO had tried to cross the border together, but HUGO was apprehended at the border and sent back to Mexico.  In August 2019, Jane Doe #3 spoke on the phone with HUGO, who was using a Mexican phone number.  During the conversation, HUGO told Jane Doe #3 that he loved her, missed her and wanted her back, and he wanted Jane Doe #3 to be with HUGO and Jane Doe #4.  He told Jane Doe #3 that he could come to Atlanta, or she could meet him and Jane Doe #4 in California.  HUGO insisted that Jane Doe #3 should go back to work in prostitution and promised that Jane Doe #3 would only work in prostitution for two years, and then she could return to Mexico.  HUGO also told Jane Doe #3 that he wanted her and Jane Doe #4 to pay his smuggling fee so that he could come to the United States.  Wire record analysis reveal that Jane Doe #4 sent wire transfers to Hugo's father, among others, in Mexico, while she was living in California.  Based on the foregoing, as well as my training, experience and involvement in the investigation, I believe that Jane Doe #4 was working in prostitution for HUGO during this time period.

12

18.     Since August 2019, Jane Doe #3 has received several additional WhatsApp messages from Hugo, from Mexican telephone number 52-222-116-5619 (the "5619 number").

19.     Law enforcement officers have also obtained wire transfer records, which confirm that Arcelia sent money to her family members and other associates of the Hernandez-Velazquez sex trafficking organization in Mexico. Specifically, from March 25, 2003 to March 14, 2019, Arcelia sent approximately $49,243.69 in 181 transactions to ten known members, associates and victims of the Hernandez-Velazquez sex trafficking organization, including Hugo and Giovanni, among others.

20.     Arcelia has continued sending wire transfers to members, associates and victims of the Hernandez-Velazquez sex trafficking organization since March 2019. For example, on or about October 2, 2019, Arcelia sent a wire transfer to Jane Doe #4 in Mexico. Wire records reveal the Jane Doe #4 returned to Mexico in or about August 2019. As set forth above, there is probable cause that Jane Doe #4 is currently being trafficked by HUGO. Based on my training, experience and involvement in the investigation, I know that traffickers will often use their victims, among other individuals, to receive or send the illicit proceeds.

21.     Other individuals connected to Arcelia and the SUBJECT PREMISES have also sent money to members, associates and victims of the Hernandez-Velazquez sex trafficking organization. For example, Arcelia's husband Joel Hernandez Rojas, who resides with Arcelia at the SUBJECT PREMISES, has frequently wired money to members and

13

associates of the Hernandez-Velazquez sex trafficking organization between 2008 and as recently as October 2019, including wire transfers to Hugo and Ernesto.

22.    The investigation has revealed that Arcelia has also taken efforts to warn other members and associates of the Hernandez-Velazquez sex trafficking organization of the law enforcement investigation. For example, on July 3, 2019, officers recovered several letters from Ernesto's jail cell at Otisville State Correctional Facility in Orange County, New York, where he was serving a five year custodial sentence in connection with a June 2016 conviction for Criminal Sexual Act in the First Degree in Queens County. Among the letters recovered were multiple letters from Arcelia to Ernesto in which she warned him, in substance and in part, "we are under investigation."[1]  In those letters, Arcelia detailed information that she had learned from individuals who had been interviewed by law enforcement agents, including questions that the agents had asked those individuals about the Hernandez-Velazquez sex trafficking organization. She also listed code words that Ernesto could use when he called Arcelia or other members of the Hernandez-Velazquez sex trafficking organization on the correctional facility's phones. In the letters, she describes communicating with members of the organization and victims through "messages" and phone calls, in which she is trying to obtain information from the individuals and monitor what is being said to law enforcement. Based on my training and experience and involved in the investigation, I believe that Ernesto's responses or other letters sent to Arcelia, as well as

---

[1] The letters that were recovered were in Spanish. The description of the letters above is based on a draft translation.

other communications to members of the organization, could be found in the SUBJECT

PREMISES, and the letters and communications, which could contain Ernesto's response

and any additional questions or directions posed by him, would constitute evidence of the

Subject Offenses and consciousness of guilt.

23.     On or about October 8, 2019, a grand jury in the Eastern District of

New York returned a superseding indictment charging that, in or about and between March

2001 and September 2019, Arcelia and other members of the Hernandez-Velazquez sex

trafficking organization committed the crimes of racketeering and racketeering conspiracy, in

violation of 18 U.S.C. §§ 1962(c), 1962(d) and 1963, sex trafficking conspiracy, in violation

of 18 U.S.C. § 1594(c), alien smuggling conspiracy, in violation of 8 U.S.C. §§

1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i), interstate prostitution conspiracy, in violation of 18

U.S.C. § 371, money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and

distribution of prostitution proceeds, in violation of 18 U.S.C. §§ 1952(a)(1)(A) and

1952(b)(1). See United States v. Arcelia Hernandez Velazquez, et al, No. 19-CR-306

(WFK). On or about October 8, 2019, Magistrate Judge Peggy Kuo of the Eastern District of

New York signed a sealed warrant for Arcelia's arrest.

## B. Probable Cause for the Search of the Subject Premises

24.     Based on my participation in this investigation and my training and

experience, and the facts set forth above and incorporated by reference herein, I submit that

that there is probable cause to believe that Arcelia has committed the Subject Offenses and

15

that the SUBJECT PREMISES contains evidence, fruits, and/or instrumentalities of violations of the Subject Offenses, for multiple reasons, as described further below.

25. First, there is probable cause to believe that Arcelia resides at the SUBJECT PREMISES. Interviews conducted with victims during the course of the investigation reveal that Arcelia has lived at the SUBJECT PREMISES since at least October 2002. For example, when Jane Doe #1 first arrived in the United States, she stated that Arcelia lived in the SUBJECT PREMISES with her husband Joel. Interviews with additional victims established, as discussed above, that victims sometimes lived at the SUBJECT PREMISES with Arcelia. During this time, Arcelia continued to live at the SUBJECT PREMISES with the victims. As recently as July 30, 2019, Arcelia sent a wire transfer to an individual in Mexico, and she listed the SUBJECT PREMISES as her address on the wire transfer record. Additionally, records obtained from T-Mobile dated October 24, 2019 for the 3164 number provide that the subscriber is Arcelia Hernandez and the address associated with the account is the SUBJECT PREMISES. Finally, a utility records check conducted on October 11, 2019, revealed that Joel Hernandez is the name associated with the account for the SUBJECT PREMISES, and the activation date for the account is October 1, 2002. As discussed above, based on the investigation, Joel Hernandez is the husband of Arcelia and resides at the SUBJECT PREMISES with Arcelia.

26. Next, there is probable cause to believe that Arcelia utilized a telephone to commit the subject offenses and evidence of these crimes, including but not limited to, communications with co-conspirators and victims, may be found on the telephone. Further,

16

there is probable cause to believe that Arcelia's telephone will be located at the SUBJECT PREMISES at the time that law enforcement intends to execute the search warrant.[2]

      a.  Based on T-Mobile records, I know that Arcelia has a cellular telephone registered to her at the SUBJECT PREMISES with phone number 646-404-3164 (the "3164 number"). The T-Mobile records confirm that the 3164 number is still in service. In addition, the T-Mobile records show that on October 2, 2019 – the same day that Arcelia wired money to Jane Doe #4 in Mexico – the 3164 number received a phone call from Hugo's Mexican number, the 5619 number.

      b.  Based on WhatsApp records, I know that, between October 2 and October 5, 2019, Arcelia used the 3164 number to exchange eight different phone calls or messages with Hugo's Mexican number, the 5619 number. In addition, between December 12, 2018 and October 25, 2019, Arcelia used the 3164 number to exchange 33 different phone calls or messages with phone numbers associated with Jane Doe #2. Based on the investigation, including

---

[2] Law enforcement intends to execute the arrest warrant for Arcelia at the same time as the search warrant for the SUBJECT PREMISES. Based on my training and experience, I know that individuals tend to keep their electronic devices on their person or at their residence at night. Moreover, as described below, location information has revealed that the location of the 3164 telephone at night is consistent with the SUBJECT PREMISES. Accordingly, there is probable cause to believe that Arcelia's telephone or telephones will be found at the SUBJECT PREMISES, when the warrant is executed since law enforcement intends to execute the warrant when Arcelia is present.

17

information obtained from Jane Doe #2, it appears that at least some of these calls were related to Arcelia's attempt to gain more information regarding the investigation, as described above in her letters to Ernesto.

c. As described above, wire transfer records confirm that Arcelia sent wire transfers to family members and other associates of the Hernandez-Velazquez family in Mexico. The wire transfer records show that Arcelia used the 3164 number to make many of those transfers. In addition, the wire records reveal that Arcelia would frequently list the SUBJECT PREMISES as her address when she sent wire transfers. Based on my training and experience and involvement in the investigation, I know that individuals who send wire transfers often receive receipts for their transfers, which could be maintained in the SUBJECT PREMISES.

d. Further, because cellular phones are portable electronic devices that, in my experience, persons generally maintain on their person and store at home, there is probable cause to believe that the phone associated with the 3164 number is at the SUBJECT PREMISES, at least at those times when Arcelia is at the SUBJECT PREMISES.

e. Additionally, on or about October 31, 2019, Magistrate Judge Ramon E. Reyes Jr. of the Eastern District of New York signed a warrant authorizing the seizure of location information for the 3164 number, which was installed on November 4, 2019. Since that date, the 3164 number has been pinging off a

18

location in the vicinity of the SUBJECT PREMISES every evening.

Specifically, on November 4, 2019, the 3164 number pinged in the vicinity of

the SUBJECT PREMISES at approximately 11:52 p.m. and pinged there again

on November 5, 2019, at approximately 10:07 a.m.  Soon thereafter, the 3164

number pinged at a different location in Queens, New York, and ultimately

began pinging in the vicinity of a McDonald's Restaurant at 2449 Broadway,

New York, New York (the "McDonald's").[3]  On November 5, 2019, at

approximately 11:51 p.m., the 3164 number pinged in the vicinity of the

SUBJECT PREMISES, and it pinged there again on November 6, 2019, at

4:52 a.m.  At approximately 5:07 a.m., the 3164 number pinged at a different

location in Queens, New York, and ultimately began pinging in the vicinity of

the McDonald's.  On November 6, 2019, at approximately 3:36 p.m., the 3164

number pinged in the vicinity of the SUBJECT PREMISES.  On or about

November 7, 2019, at approximately 4:51 a.m., the 3164 number pinged in the

vicinity of the SUBJECT PREMISES.  At approximately 5:21 a.m., the

number pinged at a different location in Queens, New York, and ultimately

began pinging in the vicinity of the McDonald's.

---

[3] Law enforcement agents have learned from several different witnesses that
Arcelia works at a McDonald's restaurant.  On or about November 6, 2019, law enforcement
agents observed an individual believed to be Arcelia inside the McDonald's; the agents
recognized Arcelia from her photographs on file with HSI.

19

27.     Based on the wire transfer records, there is also probable cause to believe that receipts and documents associated with those transfers and other evidence of the proceeds of prostitution will be located at the SUBJECT PREMISES.  Moreover, based on my training, experience and involvement in the investigation, I know that sex traffickers often remain documents related to prostitution, including records of money made or contact information for delivery drivers or other prostitution trailers or houses.

28.     In addition, based on the letters recovered from Ernesto's jail cell on July 3, 2019, there is also probable cause to believe that letters, documents and lists of code words relevant to the Hernandez-Velazquez sex trafficking organization will be located at the SUBJECT PREMISES, including letters sent to Arcelia from Ernesto in response to the letters described above.

## TECHNICAL BACKGROUND

29.     The terms "records," "documents," and "materials" include all information recorded in any form, visual or oral, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, prints, videotapes, photocopies) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical discs, smart cards, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage

20

device), as well as the equipment needed to record such information (including but not limited to cameras and video recording and storage devices).

30.     As described above and in Attachment B, this application seeks authorization to search for materials constituting evidence, fruits and/or instrumentalities of the Subject Offenses that might be found in the SUBJECT PREMISES, including on cellular telephones. One form in which the materials might be found is as data or information stored on an electronic device. Thus, the requested warrant would authorize the seizure of cellular telephones, containing electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure.

31.     Based on my training and experience, I know that, where electronic devices are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred. Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

32.     Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to seize any telephones and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

21

a. First, the volume of data on electronic devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

b. Second, because electronic data is particularly vulnerable to inadvertent or intentional modification or destruction, electronic devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

c. Third, there are so many types of electronic hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying data.

d. Fourth, many factors can complicate and prolong recovery of data from an electronic device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the device, which often take considerable time and resources for forensic personnel to detect and resolve.

33.     Following seizure of any cellular telephones and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside vendors or technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

34.     In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

22

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[4]; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the device was used.

35.     Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant

36.     Finally, if the Government determines that any seized cellular telephones are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c),

---

[4] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

the Government will return these items, upon request. Electronic data that is encrypted or

unreadable will not be returned unless law enforcement personnel have determined that the

data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii)

contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

## CONCLUSION

37. I submit that this affidavit supports probable cause for a warrant to

search the SUBJECT PREMISES described in Attachment A and seize the items described

in Attachment B. Because location information for the 3164 telephone demonstrates that

Arcelia often leaves the SUBJECT PREMISES before 6:00 a.m. and the warrant will be

executed in conjunction with the arrest warrant, reasonable cause exists to permit the

execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

It is respectfully requested that this Court issue an order sealing, until further

order of the Court, all papers submitted in support of this application, including the

application and search warrant. I believe that sealing this document is necessary because the

items and information to be seized are relevant to an ongoing investigation into the criminal

organizations as not all of the targets of this investigation will be searched at this time.

Based upon my training and experience, I have learned that online criminals actively search

for criminal affidavits and search warrants via the Internet, and disseminate them to other

online criminals as they deem appropriate, i.e., post them publicly online through the carding

24

forums.  Premature disclosure of the contents of this affidavit and related documents may

have a significant and negative impact on the continuing investigation and may severely

jeopardize its effectiveness.

Respectfully submitted,

Patrick Jochum
Special Agent
Department of Homeland Security
Homeland Security Investigations

Subscribed and sworn to before me on _____ Nov 7 _____, 2019

_____

THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE

25

## ATTACHMENT A

### I. Premises to be Searched—Subject Premises

The SUBJECT PREMISES is located at 2614 18th Street, Apartment C3, Astoria NY 11102. The SUBJECT PREMISES is located inside of a four-story apartment complex, with a brick exterior and a brown main door entrance. The SUBJECT PREMISES is located on the 3rd floor of the apartment complex and the door of the SUBJECT PREMISES is identified with the marking of C3.

The below photograph, taken October 16, 2019, depicts the front door of the SUBJECT PREMISES, which is the door on the left side of the photograph with pumpkin decorations and "3C" at the top of the door.



The below photograph from Google Maps, downloaded on or about November

6, 2019, which depicts the exterior of the building containing the SUBJECT PREMISES.



## **ATTACHMENT B**

### **II. Items to Be Seized**

#### **A. Evidence, Fruits, and Instrumentalities of the Subject Offenses**

The items to be seized from the Subject Premises, including any cellular telephones contained therein, are evidence, fruits, and/or instrumentalities of violations of racketeering and racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(c), 1962(d) and 1963, sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c), alien smuggling conspiracy, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i), interstate prostitution conspiracy, in violation of 18 U.S.C. § 371, money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and distribution of prostitution proceeds, in violation of 18 U.S.C. §§ 1952(a)(1)(A) and 1952(b)(1) (the "Subject Offenses") including:

1. Communications, including letters, phone calls, emails and text messages, between Arcelia, Hugo, Ernesto, Giovanni, Jane Does #1, #2, #3 and #4, and/or other current or former members, associates or victims of the Hernandez-Velazquez trafficking organization between 2005 and the present.

2. Receipts, ledgers, or other documents evidencing wire transfers or other payments made by Arcelia and/or other residents of the SUBJECT PREMISES to current or former members or associates of the Hernandez-Velazquez trafficking organization between 2005 and the present.

3.    Receipts, ledgers, or other documents related to prostitution, including but not limited to records related to prostitution earnings and records related to contacts utilized for the purposes of prostitution between in or about 2005 and the present.

4.    Evidence concerning occupancy or ownership of the SUBJECT PREMISES, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, diaries, statements, identification documents, address books, telephone directories, and keys, between in or about 2005 and the present.